Filed 8/31/15   P. v. Ascenio CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RODRIGO ASCENCIO,<br><br>    Defendant and Appellant. | D066806<br><br><br><br>(Super. Ct. No. SCE338858) |

APPEAL from a judgment of the Superior Court of San Diego County, Laura W. Halgren, Judge.  Affirmed.

Henry C. Coker, Public Defender, Randy Mize, Chief Deputy Public Defender, Robert Ford and Thomas Bahr, Deputy Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Charles C. Ragland and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

Rodrigo Ascencio pled guilty to driving with a blood-alcohol level of .08 percent or more causing injury (Veh. Code,[1] § 23153, subd. (b)) and failing to comply with

---

1    Subsequent unspecified statutory references are to the Vehicle Code.

duties when involved in a vehicular accident resulting in injury (§ 20001, subd. (a)). On appeal, he challenges the trial court's denial of his suppression motion. He contends his Fourth Amendment rights were violated by the warrantless seizure of a sample of his blood while he was in a sleeping, unresponsive state at the hospital after the motor vehicle collision giving rise to the charged offenses.

In *Missouri v. McNeely* (2013) __ U.S. __ [133 S.Ct. 1552, 1566] (*McNeely*), the United States Supreme Court recently clarified that, absent an exception such as consent or exigent circumstances, a warrant is required for a blood draw from a suspected drunk driver. *McNeely* rejected the principle, which had been adopted by numerous courts, that the natural dissipation of alcohol in the bloodstream always creates an exigency permitting a nonconsensual warrantless blood draw in all drunk-driving cases. The court acknowledged that the dissipation of alcohol was a relevant factor to consider on the question of exigency, but held the determination of exigency requires a case-by-case evaluation of the totality of circumstances. (*Id.* at pp. 1556, 1561.)

Responding to the government's concern about the compelling need to combat drunk driving, the *McNeely* court recognized that implied consent statutes are a legally permissible tool to obtain consensual blood draws from suspected drunk drivers. (*McNeely, supra*, 133 S.Ct. at pp. 1565-1566.) Under California's implied consent statute (§ 23612), a driver, as a condition for operating a motor vehicle (1) is deemed to have consented to chemical testing to determine blood-alcohol concentration if lawfully arrested for violating the laws prohibiting driving while intoxicated; (2) has an opportunity to withdraw this implied consent upon admonishment by an officer, subject

2

to imposition of penalties including license suspension; and (3) is deemed not to have withdrawn this implied consent if unconscious or otherwise incapable of refusing the chemical test. After *McNeely*, numerous courts have evaluated the import of its analysis on the exceptions to the warrant requirement derived from implied consent statutes and exigency principles, and concluded that *McNeely*'s essential directive is that the reasonableness of a warrantless blood draw should not rest on any *per se* exceptions to the warrant requirement, but rather requires an evaluation of all the circumstances in the particular case.

Evaluating the totality of the circumstances here, we conclude the warrantless blood draw was constitutionally permissible under consent and exigency principles. Unlike the circumstances in *McNeely*, this is not a case where the defendant *overtly refused* the blood draw, thereby creating clear Fourth Amendment coercion concerns, nor is this a case where the *sole* basis for an exigency claim was the natural dissipation of alcohol that occurs in every drunk-driving case. Rather, the record shows defendant did not withdraw his statutory implied consent at the scene; he ultimately could not do so because he fell asleep and was unresponsive; and an exigency developed at the hospital due to a CT scan that would be performed once defendant awoke. The officer could reasonably assess that defendant might be removed from his hospital bed for the medical testing before the warrant was secured and the blood draw accomplished, thereby creating the risk of a significant delay in the blood draw and undermining the evidentiary efficacy of the testing results. Under circumstances showing an unresponsive drunk driving suspect incapable of withdrawing statutory implied consent and an exigency apart

3

from the mere natural dissipation of alcohol, the officer reasonably elected to forego the warrant process. There was no Fourth Amendment violation arising from the warrantless blood draw.

FACTUAL AND PROCEDURAL BACKGROUND

*The Accident*

At about 3:47 a.m. on March 16, 2014, Deputy Sheriff Travis Womack noticed two vehicles (an Audi and a Honda) on the freeway that appeared to have just been in an accident. There was smoke coming from the Honda; its air bags had deployed; the Audi was "crunched up"; and both vehicles had extensive body damage. The Honda was unoccupied, and a male (later identified as Chad Price) was in the driver's seat of the Audi. Deputy Womack parked his patrol vehicle behind the Audi to create a block from approaching vehicles, and found defendant in the bushes on the side of the road.

When Deputy Womack asked what he was doing, defendant responded, " 'I'm drunk and I don't have a license.' " After some resistance, Deputy Womack subdued defendant, placed him in handcuffs, and escorted him to his patrol vehicle. Deputy Womack told defendant that he was not under arrest at that point but detained, and defendant kept saying, " 'Take me to County already.' " By this point the paramedics had arrived and examined defendant for injuries.

California Highway Patrol (CHP) officer Francisco Cruz arrived at the scene at about 4:14 a.m. Officer Cruz's partner placed flares to prevent collisions from approaching vehicles, while Officer Cruz investigated the accident, including taking statements from defendant and Price. Price was on a gurney inside an ambulance, and he

4

told Officer Cruz he was in pain and did not know what had happened. Defendant appeared to be in some pain, but he was conscious and able to answer Officer Cruz's questions.

Defendant acknowledged that he had been driving the Honda. Officer Cruz assessed that defendant might be under the influence of alcohol because he smelled like alcohol; his eyes were red and watery; and his speech was slurred. As part of his driving under the influence investigation, Officer Cruz asked defendant a series of field sobriety questions, which defendant answered. Defendant said he had consumed two beers, and he had not been drinking since the accident. When Officer Cruz asked defendant to perform various physical field sobriety tests, defendant repeatedly refused all his requests. Officer Cruz also asked defendant if he would perform a preliminary alcohol screening test (to measure lung air), providing him the following admonition: "*I am requesting that you take a preliminary alcohol screening test* to further assist me in determining whether you are under the influence of alcohol. *You may refuse to take this test*, however this is not a required consent test, *and if you are arrested you will be required to give a blood or breath or urine sample* for the purposes of determining actual alcoholic/drug content of your blood." (Italics added.) Defendant refused the preliminary alcohol screening test, responding, "[N]o, I understand my rights" and "Take me to County" (apparently referring to county jail).

The paramedics decided that defendant should be transported to a hospital, and Officer Cruz rode with defendant in the back of the ambulance. While in the ambulance, defendant was initially awake, but then fell asleep. They arrived at the hospital at 4:34

a.m., and defendant remained sleeping and unresponsive the entire time Officer Cruz was with him at the hospital.

*The Blood Draw*

Defendant was placed in a bed and several nurses attended to him. When Officer Cruz asked them about defendant's status, a nurse stated defendant was going to undergo a CT scan, but the nurse did not know what time this would occur because it depended on defendant waking up. No one was able to communicate with defendant; he was not answering any questions; his eyes were not open; he was not moving; and he was snoring. Officer Cruz could not determine "any concrete time" that he would be able to speak with defendant. At 4:43 a.m., while defendant was still asleep and unresponsive, Officer Cruz provided him the implied consent admonishment.[2] Defendant did not answer. Officer Cruz testified that he "took [defendant's] silence as consent."[3]

After providing the implied consent admonishment, Officer Cruz called for a phlebotomist under contract with the CHP to come to the hospital. The phlebotomist made blood draws at 5:05 a.m. and 5:12 a.m., and the subsequent testing showed defendant had a .19 blood-alcohol concentration. Defendant did not wake up during the

---

[2]     The officer's testimony does not reflect precisely when defendant was formally arrested, but there is no dispute that he was under arrest when the implied consent admonishment was provided.

[3]     Defendant maintains that Officer Cruz testified that he believed defendant "could hear the questions [he] was asking" during the implied consent admonishment. To the contrary, Officer Cruz's testimony reflects that he believed defendant could understand and answer his questions *at the scene*, but defendant thereafter fell asleep in the ambulance and was unresponsive.

6

blood draws, and he was still sleeping and unresponsive when Officer Cruz left the hospital sometime before 6:10 a.m.

Officer Cruz testified his investigation at the scene was brief, lasting about five or six minutes; i.e., he contacted defendant, and "immediately after that he went and jumped into the ambulance and went to the hospital" with defendant. Officer Cruz had been a CHP officer for four years; he had received training on the *McNeely* case; he knew telephonic warrants were authorized under the Penal Code; he had never "had to call in for a warrant before"; and he did not try to secure a telephonic warrant at any point, including after defendant did not respond to the implied consent admonishment.

*Trial Court's Ruling*

In support of his suppression motion, defendant argued that based on the totality of the circumstances a warrant was required for the blood draw. Defense counsel stated technological advances allowed warrants to be obtained "rather quickly"; it was common knowledge that this was true in San Diego County; and officers were allowed to call for a warrant on a cell phone. Further, when awake and fully conscious at the scene, defendant had repeatedly refused multiple field sobriety tests and preliminary alcohol screening and he was admonished about the implied consent requirement that he provide a blood sample, and he had "expressed, clearly, his wish to not consent to all these field sobriety tests [or] to getting blood drawn or anything of that nature." Also, defendant noted the officer did not try to wake him up at the hospital, and maintained the Vehicle Code statute (§ 23612, subd. (a)(5)), providing that implied consent is deemed not to be

7

withdrawn if the drunk-driving suspect was unconscious or otherwise incapable of refusing, was inapplicable to the facts of his case.

Further, defendant asserted there were no exigent circumstances justifying the warrantless blood draw. He contended the delay between the accident and the arrival at the hospital was not significant, and when he fell asleep and could not respond to the implied consent admonishment, the officer should have called in for a telephonic warrant.

Opposing the suppression motion, the prosecutor argued that under the implied consent statute, defendant had not withdrawn his implied consent. That is, defendant was asleep or unconscious; he was not communicating with anyone or responding; he could not refuse and did not withdraw his consent; and his refusals at the scene did not mean he would have refused had he been awake at the hospital.

The prosecutor further asserted the officer could reasonably believe there were exigent circumstances under which the delay necessary to obtain a warrant threatened the destruction of the evidence. The prosecutor stated the officer did not know when defendant would wake up and be taken away for the CT scan and other possible medical procedures of unknown duration, and the officer should not have to risk that defendant might be removed for an unknown length of time before the warrant process was completed, thereby delaying the blood draw for potentially hours and causing the loss of evidence through the dissipation of alcohol in the blood. The prosecutor argued an officer should not "have to take that risk, get on the phone and start a process, and then in the middle of that lose evidence because the defendant awakens" and is taken away by medical staff.

8

After considering the parties' arguments, the court stated that it had to decide whether it was reasonable for the officer to determine that defendant was incapable of making a refusal under the implied consent law, and that there were exigent circumstances which "would call for the dissipation of . . . blood alcohol in the defendant's blood." The trial court concluded that "on balance the officer did act reasonably in allowing the blood draw, and not obtaining a search warrant," and accordingly denied the suppression motion.

## DISCUSSION

### I. *Search and Seizure Principles*

The Fourth Amendment protects against unreasonable searches and seizures, and generally requires that a warrant be issued before a search or seizure. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.) However, "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." (*Kentucky v. King* (2011) ___ U.S. ___ [131 S.Ct. 1849, 1858].) "[T]he 'touchstone of the Fourth Amendment is reasonableness' " and "[r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances." (*Ohio v. Robinette* (1996) 519 U.S. 33, 39.) The "objective reasonableness of a particular [search or] seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " (*Plumhoff v. Rickard* (2014) __ U.S. __ [134 S.Ct. 2012, 2020].)

9

The withdrawal of a blood sample constitutes a search governed by Fourth Amendment standards.  (*McNeely, supra*, 133 S.Ct. at p. 1558.)  A blood draw requires a physical intrusion into a person's skin and veins, and constitutes "an invasion of bodily integrity" that "implicates an individual's 'most personal and deep-rooted expectations of privacy.' "  (*Ibid.*)  Accordingly, even when a driver is lawfully arrested based on probable cause of intoxication, a warrant is required for a blood draw unless the government establishes by a preponderance of the evidence that an exception to the warrant requirement rendered the warrantless blood draw constitutionally permissible.  (*Ibid.*; see *People v. Rios* (2011) 193 Cal.App.4th 584, 590.)

Exigent circumstances and voluntary consent are two well-recognized exceptions to the warrant requirement that can justify a warrantless blood draw.  (*McNeely, supra*, 133 S.Ct. at pp. 1558, 1566; see *Schneckloth v. Bustamonte, supra*, 412 U.S. at p. 219.)  When evaluating whether an officer could reasonably rely on an exception to the warrant requirement, the facts are " ' "judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" ' "  (*People v. Glick* (1988) 203 Cal.App.3d 796, 801; *Kentucky v. King, supra*, 131 S.Ct. at p. 1859.)

A.  *The Exigency Exception to the Warrant Requirement*

Under the exigency exception to the warrant requirement, the circumstances must show " 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.' "  (*McNeely, supra*, 133 S.Ct. at p. 1558.)  For example, an exigency may arise when there

is a need to prevent the imminent destruction of evidence; in this circumstance "a warrantless search is potentially reasonable because 'there is compelling need for official action and no time to secure a warrant.' " (*Id.* at p. 1559.)

In *Schmerber v. California* (1966) 384 U.S. 757, the United States Supreme Court evaluated the constitutionality of a warrantless withdrawal of a blood sample from a drunk-driving suspect who had refused to consent to the test. (*Id.* at pp. 758-759, 770.) The suspect had been injured and taken to the hospital for treatment; he was arrested at the hospital while receiving treatment; on the advice of counsel he refused to consent to the blood test; and the officer nevertheless directed a physician to withdraw the blood sample. (*Id.* at pp. 758-759.) Applying the exigency exception, the *Schmerber* court concluded the officer could have reasonably believed he was confronted with an emergency in which the delay necessary to obtain a warrant threatened the destruction of evidence, noting that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, and the officers had no time to seek out a magistrate for a warrant during the time needed to take the injured suspect to the hospital and to investigate the accident scene. (*Id.* at pp. 770-771.)

Based on *Schmerber*, numerous courts formulated a rule that "the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." (*McNeely, supra*, 133 S.Ct. at p. 1558; *People v. Jones* (2014) 231 Cal.App.4th 1257, 1263-1265.) *McNeely* rejected this interpretation of

11

*Schmerber*, explaining the existence of an exigency "must be determined case by case based on the totality of the circumstances." (*McNeely, supra*, at p. 1556.)

In *McNeely*, the drunk-driving suspect consented to field sobriety tests; twice refused to provide a breath sample; was taken to a hospital for blood testing; and at the hospital was admonished based on the state's implied consent statute that refusal of the blood test would result in a one-year revocation of his license and could be used against him in a future prosecution. (*McNeely, supra*, 133 S.Ct. at p. 1557.) The suspect refused the blood test, but the officer nonetheless directed a technician to take a blood sample. (*Ibid.*) Defendant succeeded in suppressing the evidence based on the warrantless nonconsensual blood draw, and the United States Supreme Court affirmed. (*Id.* at pp. 1557-1558.)

The *McNeely* court rejected the state's argument that there should be a "*per se* rule for blood testing in drunk-driving cases" so that "whenever an officer has probable cause to believe an individual has been driving under the influence of alcohol, exigent circumstances will necessarily exist because [blood-alcohol concentration] is inherently evanescent" and hence "it is categorically reasonable for law enforcement to obtain the blood sample without a warrant." (*McNeely, supra*, 133 S.Ct. at p. 1560.) Declining to sanction a *per se* exigency rule, *McNeely* explained the natural dissipation of alcohol in the blood is one circumstance to consider when evaluating exigency, but there may be other circumstances showing the warrant process would *not* cause a significant delay in the performance of the blood test, and when the "officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the

12

search, the Fourth Amendment mandates that they do so." (*Id*. at pp. 1561.) For example, the circumstances might show one officer could take steps to secure a warrant while another officer transports the suspect to a medical facility, or that modern technological devices or streamlined procedures are available to permit expeditious processing of warrant applications. (*Id*. at pp. 1561-1562.) *McNeely* concluded: "[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case . . . , it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." (*Id*. at p. 1563.)

Although it reiterated the traditional totality of the circumstances test for warrantless blood draws in drunk-driving cases based on claims of exigency, *McNeely* recognized that warrants "inevitably take some time for police officers or prosecutors to complete and for magistrate judges to review"; a significant delay in the performance of a blood test could raise questions about the accuracy of the blood-alcohol level calculation; and accordingly the delay caused by the warrant application process could in some cases show exigent circumstances justifying a warrantless blood draw. (*McNeely, supra*, 133 S.Ct. at pp. 1562-1563.)

*McNeely* reasoned that officers "can make reasonable judgments about whether the warrant process would produce unacceptable delay under the circumstances" and "[r]eviewing courts in turn should assess those judgments ' "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ' " (*McNeely, supra,* 133 S.Ct. at p. 1564, fn. 7.) *McNeely* elaborated that an exigency may

13

arise even in a " 'routine' " drunk-driving case, explaining: "[T]he fact that a particular drunk-driving stop is 'routine' in the sense that it does not involve ' "special facts," ' . . . such as the need for the police to attend to a car accident, does not mean a warrant is required. Other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case." (*Id.* at p. 1568; see *People v. Toure* (2015) 232 Cal.App.4th 1096, 1104-1105 [exigency existed based on factors in addition to natural dissipation of alcohol in blood].)[4]

B. *The Consent Exception to the Warrant Requirement*

Under the consent exception to the warrant requirement, a warrantless search may be conducted when the totality of the circumstances show the person consented to the search, and the consent was voluntary and not the product of express or implied coercion.

---

[4]     The trial court in the *McNeely* case found there were no exigent circumstances because the officer had failed to identify any factors that would suggest he faced an emergency or unusual delay in securing a warrant, and his testimony supported that a prosecutor and judge were readily available to issue a warrant. (*McNeely, supra*, 133 S.Ct. at pp. 1567-1568.) On review before the United States Supreme Court, the government confined its argument to the claim that there should be a *per se* exigency rule in drunk-driving cases, and accordingly the high court declined to evaluate the lower court's exigency finding or elaborate further on the factors that can establish exigency. (*Id.* at p. 1568.)

(*Schneckloth v. Bustamonte, supra*, 412 U.S. at p. 227.)  In the context of drunk-driving laws, California (along with all the other states) has enacted an implied consent statute that places a driver lawfully arrested for drunk driving on notice that he or she has consented to a chemical test to determine blood-alcohol concentration.  (§ 23612; see *McNeely, supra*, 133 S.Ct. at p. 1566.)

*California's Implied Consent Statute*

Section 23612 states:  "*A person who drives a motor vehicle is deemed to have given his or her consent* to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested" for a driving while intoxicated offense.  (§ 23612, subd. (a)(1)(A), italics added.)  The statute requires the officer to tell the person that the failure to submit to the chemical test will result in various penalties including a fine, suspension of the driving privilege, and (in some cases) mandatory incarceration; the person does not have the right to have an attorney present before stating whether he or she will submit to the test; and a refusal may be used against the person in a court of law.  (§ 23612, subds. (a)(1)(A), (D), (a)(4).)[5]  Further,

---

[5]      These section 23612 provisions state:

"*A person who drives a motor vehicle is deemed to have given his or her consent to chemical testing* of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested for an offense allegedly committed in violation of [the driving under the influence statutes] Section 23140, 23152, or 23153.  If a blood or breath test, or both, are unavailable, then paragraph (2) of subdivision (d) [providing for a urine test] applies."  (§ 23612, subd. (a)(1)(A), italics added.)

"*The person shall be told that his or her failure to submit to*, or the failure to complete, *the required chemical testing will result in a fine, mandatory imprisonment if the person is convicted of a violation of Section 23152 or 23153, and (i) the suspension of*

addressing the situation when the person is unable to exercise the right to withdraw the implied consent, the statute states: "*A person who is unconscious or otherwise in a condition rendering him or her incapable of refusal is deemed not to have withdrawn his or her consent* and a test or tests may be administered whether or not the person is told that his or her failure to submit to, or the noncompletion of, the test or tests will result in the suspension or revocation of his or her privilege to operate a motor vehicle . . . ." (§ 23612, subd. (a)(5), italics added.)

The implied consent statute also distinguishes between testing at the scene for purposes of *investigating* whether the driver is intoxicated, and testing for purposes of *evidence gathering* once the driver is lawfully arrested for drunk driving. Regarding investigatory testing, section 23612, subdivision (h) states that a preliminary alcohol screening test based on a breath sample that is used to establish reasonable cause that the person was driving under the influence "is a field sobriety test and may be used by an officer as a further investigative tool." Section 23612, subdivision (i) sets forth the advisements the officer must provide concerning the preliminary alcohol screening test, including that the officer is requesting the screening to assist in determining if the person is under the influence; the person has the right to refuse the screening test; and the

---

*the person's privilege to operate a motor vehicle* for a period of one year [or more] . . . ." (§ 23612, subd. (a)(1)(D), italics added.)

"*The officer shall also advise the person that he or she does not have the right to have an attorney present* before stating whether he or she will submit to a test or tests, before deciding which test or tests to take, or during administration of the test or tests chosen, *and that, in the event of refusal to submit to a test or tests, the refusal may be used against him or her in a court of law*." (§ 23612, subd. (a)(4), italics added.)

16

obligation to submit to a chemical test as required by the implied consent statute is not satisfied by submitting to the preliminary screening test.[6] (See *People v. Wilson* (2003) 114 Cal.App.4th 953, 957-960.)

In cases decided before *McNeely*, the courts recognized that drunk-driving implied consent statutes created voluntary consent for Fourth Amendment purposes, reasoning that under the law the motorist has "*already given his implied consent* to evidentiary testing by driving on [a] road." (*State v. Diaz* (Idaho 2007) 160 P.3d 739, 742, italics added.) As one court explained: "In addition to . . . exigent circumstances . . . , the statutorily created implied consent of the motorist permits the warrantless search of the motorist's breath or blood. [Citations.] . . . [A]nyone who exercises the privilege of operating a motor vehicle in this state has *consented in advance* to submit to a breath alcohol test." (*State v. Humphreys* (Tenn. 2001) 70 S.W.3d 752, 761, italics added.) Another court elaborated: "The central feature of the Implied Consent Law is that persons who avail themselves of the privilege of driving on the state's public streets and

---

6       Section 23612, subdivisions (h) and (i) states:
"(h) *A preliminary alcohol screening test* that indicates the presence or concentration of alcohol based on a breath sample in order to establish reasonable cause to believe the person was driving a vehicle in violation of Section 23140, 23152, or 23153 is a field sobriety test and *may be used by an officer as a further investigative tool*.
        (i) If the officer decides to use a preliminary alcohol screening test, the officer shall *advise the person that he or she is requesting that person to take a preliminary alcohol screening test* to assist the officer in determining if that person is under the influence of alcohol or drugs, or a combination of alcohol and drugs. *The person's obligation to submit to a blood, breath, or urine test, as required by this section*, for the purpose of determining the alcohol or drug content of that person's blood, *is not satisfied by the person submitting to a preliminary alcohol screening test*. The officer *shall advise the person of that fact and of the person's right to refuse to take the preliminary alcohol screening test*." (Italics added.)

highways are deemed to have consented to a chemical analysis of their blood alcohol level or drug content. [Citations.] *This 'implied consent' allows law enforcement officers to obtain blood in circumstances in which a warrant or actual consent may otherwise be required.* 'Therefore, . . . obtaining blood from an arrestee on probable cause without a warrant and without actual consent does not offend the constitutional guarantees of . . . freedom from unreasonable search and seizure . . . .' " (*State v. Smith* (Mo.Ct.App. 2003) 134 S.W.3d 35, 39, italics added; see *People v. Sugarman* (2002) 96 Cal.App.4th 210, 214 [California drivers impliedly consent to the chemical testing of their blood if they are arrested for violating driving under the influence laws].)

*Post-*McNeely *Evaluation of Implied Consent Statutes*

In *McNeely,* the United States Supreme Court gave a nod of approval to implied consent statutes when responding to the contention that the government's compelling interest in combating drunk driving required access to prompt blood testing procedures. (*McNeely, supra*, 133 S.Ct. at pp. 1565-1566.) *McNeely* stated, ". . . *States have a broad range of legal tools to enforce their drunk-driving laws* and to secure [blood-alcohol concentration] evidence without undertaking warrantless nonconsensual blood draws. *For example, all 50 States have adopted implied consent laws* that require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood-alcohol concentration] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense. [Citation.] Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a [blood-alcohol

18

concentration] test to be used as evidence against him in a subsequent criminal prosecution." (*Id.* at p. 1566, italics added.)

Subsequent to *McNeely*, numerous courts have scrutinized the application of their state's implied consent statutes to determine whether a warrantless blood draw comported with the standards and principles enunciated in *McNeely*. In *People v. Harris* (2015) 234 Cal.App.4th 671, the defendant provided *actual* consent to the blood test after he was admonished under the implied consent statute that refusal would result in license suspension and could be used against him, and the court found his consent was voluntary notwithstanding the imposition of a penalty should he refuse the test. (*Id.* at pp. 678, 682, 685, 687.) The *Harris* court reasoned that the "fact that a motorist is told he will face serious consequences if he refuses to submit to a blood test does not, in itself, mean that his submission is coerced," and concluded that under the totality of the circumstances the defendant freely and voluntarily agreed to submit to the blood draw. (*Id.* at pp. 682, 685.) That is, even though the defendant was told he would incur a penalty if he refused to take the test, he was still given a choice to consent or refuse, and the penalty did not rise to the level of coerciveness so as to render the consent constitutionally involuntary. (*Id.* at pp. 682, 687, 690-692; accord *State v. Brooks* (Minn. 2013) 838 N.W.2d 563, 569-570.) Using similar reasoning, another court stated: "[I]t is difficult to see why the disclosure of accurate information about a particular penalty that may be imposed—if it is permissible for the state to impose that penalty—could be constitutionally coercive. *Rather, advising a defendant of the lawful consequences that may flow from his or her decision to engage in certain behavior ensures that that defendant makes an informed*

19

*choice whether to engage in that behavior or not*. . . . Of course, accurately advising a defendant of a lawful penalty that could be imposed may well play a role in the defendant's decision to engage in the particular behavior, but that does not mean that the defendant's decision was 'involuntary.' " (*State v. Moore* (Or. 2013) 318 P.3d 1133, 1138, italics added.)

The courts have recognized that the core principle under *McNeely* is that the states may not establish *per se* exceptions to the warrant requirement for blood draws, and that each case—including those involving use of implied consent statutes—must be evaluated for Fourth Amendment constitutional reasonableness under the totality of circumstances. (See, e.g., *State v. Wulff* (Idaho 2014) 337 P.3d 575, 580-582 [implied consent statute created unconstitutional per se exception to warrant requirement when interpreted not to recognize driver's right to revoke statutory implied consent]; accord *Byars v. Nevada* (Nev. 2014) 336 P.3d 939, 945-947; *Aviles v. State* (Tex. App. 2014) 443 S.W.3d 291, 292-294 [implied consent statute created improper per se exception to warrant requirement by requiring officer to order blood test over defendant's refusal based on prior driving while intoxicated convictions]; *Flonnory v. State* (Del. 2015) 109 A.3d 1060, 1065 [statutory implied consent does not automatically dispense with warrant requirement; totality of circumstances must be examined to determine voluntary consent]; *State v. Halseth* (Idaho 2014) 339 P.3d 368, 371 [implied consent statute does not alone justify warrantless blood draw from driver who refuses to consent; "[i]nherent in the requirement that consent be voluntary is the right of the person to withdraw that consent"]; see also *People v. Harris, supra*, 234 Cal.App.4th at p. 689 ["Because

20

submission to a blood test is not coerced merely because it is made after advisement under the implied consent law, we must determine whether defendant's submission in this case was freely and voluntarily given under the normal totality of the circumstances analysis."].)

## II. *Analysis*

On appeal from a ruling on a suppression motion, we defer to the trial court's express and implied factual findings if they are supported by substantial evidence, and we exercise our independent judgment in determining whether, on the facts so found, the search and seizure was reasonable under the Fourth Amendment. (*People v. Toure, supra*, 232 Cal.App.4th at p. 1103.)

Applying the standard set forth in *McNeely*, the question before us is whether under the totality of the circumstances Officer Cruz could reasonably determine the warrantless blood draw was permissible based on consent or exigent circumstances. Initially, we note that it is apparent from *McNeely* that Officer Cruz was *not* required to immediately commence the warrant process for a blood draw upon his arrival at the scene and encounter with a suspected drunk driver. It was proper for him to first carry out the necessary law enforcement duties related to a motor vehicle collision, including observing the physical evidence at the scene, investigating for indicia of intoxication, deciding whether defendant should be arrested, and allowing the paramedics to determine whether defendant needed medical attention at a hospital.

Further, given *McNeely*'s recognition of the propriety of implied consent statutes when balancing the state's need for prompt blood draws against a driver's right to be free

from unreasonable intrusions, Officer Cruz was entitled to consider the existence of statutory implied consent for postarrest testing and was not required to commence the warrant process until he had the opportunity to determine whether defendant wished to revoke his implied consent. Also, there is nothing in *McNeely* that precluded Officer Cruz from considering, along with all the other circumstances, the fact that defendant had been rendered incapable of withdrawing statutory implied consent when evaluating whether a warrantless blood draw was appropriate.

With these principles in mind, we conclude defendant's refusals at the scene did not constitute a refusal of all further testing, including a postarrest blood draw, and hence Officer Cruz's duty to seek a warrant was not triggered at this juncture. Further, unlike the circumstances in *McNeely*, defendant never overtly refused the blood draw; he ultimately was incapable of doing so because he was asleep and unresponsive; the planned CT scan created a risk that defendant would become unavailable for a blood draw for an undetermined amount of time; and this latter circumstance created an exigency beyond the natural dissipation of alcohol that occurs in every drunk-driving case. Under the totality of the circumstances, Officer Cruz could reasonably determine it was appropriate to perform a warrantless blood draw because defendant's statutory implied consent was intact and there was an exigency created by the pending CT scan.

*Refusals at the Scene*

Defendant contends his refusals of testing at the scene necessarily meant he was telling Officer Cruz he would refuse any and all subsequent test requests, so as to trigger Officer Cruz's obligation to seek a warrant for a blood draw at this juncture absent

22

exigent circumstances. He posits Officer Cruz "could have initiated a telephonic warrant while accompanying [him] in the ambulance." We are not persuaded.

At the scene of the accident, Officer Cruz asked defendant to consent to the physical field sobriety tests and the preliminary alcohol screening, and when inquiring about the latter provided defendant a standard admonishment stating that he *could refuse* to submit to the preliminary alcohol screening test, but *if he was arrested* he would be *required* to provide a blood, breath or urine sample. Thus, defendant was asked at the scene only whether he would consent to the physical sobriety testing and preliminary screening, whereas he was affirmatively told the postarrest testing was of a mandatory nature. Because defendant would have understood that he had a choice during the investigation at the scene, whereas his obligations were entirely different after his arrest, Officer Cruz could reasonably conclude his refusal at the scene did not convey a refusal to postarrest testing.

Further, defendant was not admonished at the scene about the penalties that would apply in the event he refused postarrest testing, including a fine, suspension of the driving privilege, and mandatory incarceration upon conviction. If he had stayed awake, he would have been told that these consequences *did* apply if he refused the postarrest testing at the hospital. These consequences, although not constitutionally coercive, are significant and could well have swayed defendant to consent to the testing at the hospital rather than incur the penalties. Indeed, the very purpose of these consequences is to encourage a suspect to voluntarily consent in lieu of incurring the penalties. (*Hughey v. Department of Motor Vehicles* (1991) 235 Cal.App.3d 752, 757.) In contrast, when faced

with the choice of undergoing the testing at the scene, defendant may have readily declined consent because there were no penalties associated with this refusal. Under these circumstances, Officer Cruz could reasonably view defendant's refusals at the scene as limited to the tests then under consideration and as not meaning defendant would necessarily refuse the blood draw upon transport to a medical facility and admonishment of the consequences.

*Officer's Decision To Dispense with the Warrant Process*

Once defendant fell asleep and remained unresponsive at the hospital, Officer Cruz could reasonably determine he was no longer capable of withdrawing his statutory implied consent. Further, once Officer Cruz was apprised of the planned CT scan, he could reasonably decide that it was appropriate to order the blood draw without taking time to secure a warrant.

Defendant suggests Officer Cruz should have attempted to wake him, or sought the assistance of medical personnel to do this, so that Officer Cruz could have meaningfully determined whether he wanted to withdraw his implied consent. Officer Cruz testified no one could communicate with defendant, and it is apparent from the record that defendant was entirely unresponsive. Under these circumstances, Officer Cruz could not reasonably be expected to use, or request that medical personnel use, physical contact to try to awaken defendant, particularly given the possibility that he had sustained internal injuries from the car collision.

Evaluating the reasonableness of the warrantless intrusion here, Officer Cruz could reasonably rely on the fact that defendant's implied consent was intact because he

24

was not capable of responding one way or the other regarding the blood draw; thus, the officer was not faced with a suspect who had overtly refused the test. Further, Officer Cruz could reasonably assess that defendant might wake up at any time and be removed for the CT scan, and defendant would then become unavailable for a blood draw for an undetermined amount of time. When Officer Cruz provided the implied consent admonishment at 4:43 a.m., almost one hour had already passed since Deputy Womack first discovered the accident at 3:47 a.m. Officer Cruz had no means of evaluating how long defendant would remain in the bed and available for a blood draw, or how long he would be gone once taken for the CT scan. As recognized in *McNeely*, notwithstanding the advancement in technology and streamlining of warrant procedures, a warrant request is not an instantaneous process and it necessarily takes some time to submit the request and obtain approval for the warrant. Nor could Officer Cruz reasonably be expected to seek out the hospital personnel in charge of defendant's treatment for purposes of trying to delay the CT scan in the event defendant woke up before the warrant was secured and the blood draw accomplished.[7]

---

[7] Defendant argues the trial court erred in overruling his hearsay objection to Officer Cruz's testimony that a nurse told him about the planned CT scan. The court properly admitted the testimony as nonhearsay because the relevant matter under consideration was the effect of the statement on Officer Cruz (whether he could reasonably assess that he should forego the warrant process and order the blood draw due to the planned CT scan), rather than the truth of whether the medical staff actually intended to take defendant for a CT scan. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1162 [statement offered to prove effect on hearer is not hearsay because " ' "it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement" ' "].)

Defendant also contends the court erred by failing to admit a CHP video of defendant with Officer Cruz at the scene. The court apparently watched the video but did

Given the uncertainty about the timing and duration of defendant's removal for the CT scan that could interfere with the blood draw, Officer Cruz reasonably summoned the phlebotomist and directed him to take the blood sample without taking time to obtain a warrant. Officer Cruz could reasonably conclude that if he started the warrant process and waited for approval of the warrant request, he risked losing defendant's availability if defendant woke and was transported away for a CT scan. Further, he risked the passage of an unknown amount of additional time while defendant was removed for the medical testing, which could significantly compromise the efficacy of the blood-alcohol evidence due to the continued dissipation of the alcohol in defendant's blood.

Also, there are no circumstances suggesting that Officer Cruz should have ascertained the need for a warrant and secured it at an earlier point during the performance of his duties. Officer Cruz arrived at the scene at 4:14 a.m.; 20 minutes later (at 4:34 a.m.) he was at the hospital with defendant where he was told defendant would undergo a CT scan when he woke; and 10 minutes after his arrival at the hospital (at 4:43 a.m.) he provided the implied consent admonishment. It would not be reasonable to expect Officer Cruz to interrupt the performance of his investigatory duties for a serious accident during the short time he was at the scene to inquire whether defendant wanted to revoke his implied consent, nor could he reasonably be expected to interject himself into the paramedic arena to make this inquiry during the short ride in the ambulance to the hospital. Officer Cruz had no way of knowing that defendant would fall asleep in the

not admit it because defendant had not provided a transcript and the video was cumulative to the officer's testimony describing defendant's refusals. Defendant has not shown prejudice from this ruling even assuming there was error.

26

ambulance and remain asleep and unresponsive for a prolonged period of time. Thus, he

cannot be faulted for failing to provide the implied consent admonishment before

defendant fell asleep and became unresponsive. Moreover, once at the hospital, the

exigency concerning the CT scan quickly arose, and Officer Cruz reasonably elected to

go forward with a blood draw without further delay.

Defendant argues there was no exigency because the blood draw occurred about

one hour after the accident, and the Vehicle Code provides for a "three hour presumption

that a sample is presumed valid under the law." In support, he cites section 23152,

subdivision (b) which states there is a rebuttable presumption that a defendant had a

blood-alcohol level of .08 or more at the time of driving if he measured at this level in a

chemical test performed within three hours after the driving. This statutory provision

does not defeat the exigency showing. First, Officer Cruz had no way of knowing

whether the blood draw could be accomplished within three hours of the driving if

defendant was removed for the CT scan before the warrant process and blood draw could

be completed. Second, the statutory provision does not ensure that a blood draw within a

three-hour timeframe will produce effective blood-alcohol level evidence, nor does it

ensure that a driver who has a .08 or higher blood-alcohol level at the time of driving will

necessarily measure at this level within three hours of driving so as to trigger the

presumption.

In *People v. Thompson* (2006) 38 Cal.4th 811, the court rejected the same claim

made by defendant concerning this statutory provision, explaining, "Defendant contends

that no exigency existed because there is a rebuttable presumption that a driver had a

27

blood-alcohol level of 0.08 percent or more at the time of driving if the person had a blood-alcohol level of 0.08 percent or more in a chemical test performed 'within three hours after the driving.'. . . That the jury may, but is not required to, conclude that defendant's blood-alcohol level was in excess of legal limits based on a test taken within three hours of the driving does not eviscerate the People's interest in securing a blood test as soon as possible." (*Id.* at p. 826.)

Finally, defendant asserts the exigency arising from the planned CT scan cannot properly be considered because Officer Cruz did not expressly indicate that he ordered the blood draw due to exigencies. The contention is unavailing. Officer Cruz's testimony that he asked the medical staff about defendant's status and was told about the anticipated CT scan supports an inference that he was concerned about whether he would be able to coordinate the blood draw with whatever measures were going to be taken to address defendant's medical needs. In any event, Fourth Amendment constitutional reasonableness turns on an evaluation of the totality of the circumstances under an *objective* standard, and it is not controlled by an officer's subjective motivations. (*Kentucky v. King, supra*, 131 S.Ct. at p. 1859.)

Considering the totality of circumstances, Officer Cruz could reasonably determine that it was appropriate to perform a warrantless blood draw. Because defendant did not withdraw his statutory implied consent at the scene and he subsequently became incapable of withdrawing that consent, this is not a case where the blood draw was accomplished over a defendant's overt refusal. Further, the pending CT scan created an exigency apart from the mere natural dissipation of alcohol in that

28

defendant could become unavailable for a blood draw for an undetermined amount of time, thereby significantly impacting the efficacy of the blood-alcohol evidence. The trial court did not err in denying the suppression motion based on the warrantless blood draw.

DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

29